UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| JESSE DUHAMEL,<br><br>                        Plaintiff,<br><br>        v.<br><br>STATE OF WASHINGTON, et al.,<br><br>                        Defendants. | CASE NO. 2:20-cv-00337-RSM-BAT<br><br>**REPORT AND RECOMMENDATION** |

Plaintiff Jesse Duhamel has filed this civil rights and negligence lawsuit against the State of Washington, the Department of Corrections ("DOC"), and three DOC medical professionals. Plaintiff seeks partial summary judgment on his negligence claims against all defendants. Dkt. 18. Defendants State of Washington, DOC, C. Shaw, Adelaide Horne, and P. Christiansen (collectively "State Defendants") seek summary judgment on Plaintiff's claims in their entirety. Dkt. 24.

Having reviewed the parties' briefing, summary judgment evidence, and balance of the record, the undersigned recommends that Plaintiff's motion for partial summary judgment (Dkt. 18) be **denied**; State Defendants' motion for summary judgment (Dkt. 24) be **denied** as to Plaintiff's negligence claim; and Defendants' motion for summary judgment (Dkt. 24) be **granted** as to Plaintiff's Section 1983, ADA and Rehabilitation Act, and outrage claims.

REPORT AND RECOMMENDATION - 1

BACKGROUND

A.     Parties

Plaintiff is currently incarcerated at DOC's Monroe Correctional Complex ("MCC") in the Twin Rivers Unit ("TRU"). Dkt. 2 at 2, ¶ 3.

Defendant C. Shaw is a registered nurse at MCC TRU. Dkt. 2 at 3, ¶ 9. Defendant Adelaide Horne was a Physician Assistant at MCC TRU. *Id.* at 3, ¶7. Defendant P. Christiansen was a Physician Assistant at MCC TRU. *Id.* at 2, ¶ 6.

The Court dismissed Plaintiff's claims against Defendants Lee Stemler, Kevin Bovenkamp, and Dr. Julia Barnett based upon the parties' stipulated motions. Dkt. 13 and 17.

B.     Statement of Facts

Plaintiff has suffered from severe chronic abdominal pain and gastrointestinal bleeding for several years. Dkt. 20, Declaration of Jesse Duhamel at ¶1. Plaintiff's chronic condition was closely followed by TRU providers as he had been declaring medical emergencies every few months due to extreme pain and bleeding, and he was supposed to have regular lab work and routine follow-ups. *Id.*, Duhamel Dec. at ¶2; Dkt. 19, Ex. D (Grievance Investigation Report).

In June 2018, Plaintiff was suffering from chronic abdominal pain and rectal bleeding. Dkt. 2 at 4, ¶ 15. He had been transferred to MCC in part to get additional medical care. Dkt. 25, Declaration of Scott Barbara, Ex. A at 6-7. Plaintiff's primary care provider was Defendant Christiansen. *Id.* at 8. In June 2018, Defendant Christiansen requested that Plaintiff be referred out to a gastroenterologist for a consultation, which request was granted. *Id.*, Ex. B at 16-17. The consultation was scheduled to occur during the time Plaintiff was hospitalized in August 2018 and, consequently, did not occur until a few weeks later. *Id.*, Ex. B at 16-17.

REPORT AND RECOMMENDATION - 2

In August 2018, Plaintiff had a dental issue for which the dentist prescribed antibiotics and ibuprofen. Dkt. 25, Barbara Dec., Ex. D at 22-23. Two days later, Defendant Christiansen was notified by a nurse who saw Plaintiff during sick call for a toothache that his prescribed antibiotics were not helping him. Dkt. 19, Declaration of Darryl Parker, Ex. Q (August 17, 2018 Nursing Notes). Defendant Christiansen instructed the nurse to inform Plaintiff that he should continue taking his prescribed medication and alternate between Tylenol and Ibuprofen. *Id.* Antibiotics and Ibuprofen, which is a non-steroidal anti-inflammatory, are generally known to potentially cause stomach upset and potentially aggravate IBS. Dkt. 37, Declaration of Deborah J. Gingeresky, ¶ 7. In addition, Plaintiff was taking over the counter Naproxen in June 2018, which is an additional non-steroidal anti-inflammatory medication, also known to potentially cause GI irritation, especially if taken in combination with other similar medications. *Id.*

### 1. First Medical Emergency

Shortly after 9:00 p.m. on August 21, 2018, Plaintiff called a medical emergency. Dkt. 19, Declaration of Darryl Parker, Ex. F at 16. Defendant C. Shaw responded. *Id.* Defendant Shaw knew Plaintiff's medical history as she had previously signed off on at least one encounter report ordering medication for his conditions. *Id.*, Ex. G (August 7 Encounter Report). Defendant Shaw spoke with Plaintiff, took his vitals, and called Phu Ngo, the on-call physician assistant ("PA"). PA Ngo concluded there was nothing about Plaintiff's presentation that could not wait until sick call the next morning. Dkt. 38, Declaration of Phu H. Ngo at 4-3, ¶¶ 9-11. Plaintiff states that he told Defendant Shaw that he was bleeding, but she did not examine him and sent him back to his cell after checking his vitals. Dkt. 20, Duhamel Dec., ¶ 4.

### 2. Second Medical Emergency

At approximately 1:20 a.m. on August 22, 2018, Plaintiff called a second medical emergency. Dkt. 19, Parker Dec., Ex. H at 20-21. RN Terri Volk spoke with Plaintiff, took his vitals, and examined him. *Id.* Nurse Volk noted that Plaintiff complained of rectal bleeding and abdominal pain; there was no rebound tenderness and BT present in all 4 quadrants; Plaintiff's last BM was just prior to call; blood light pink noted in toilet paper; no frank blood or coffee ground colored blood; no nausea or vomiting, but Plaintiff reported having diarrhea all day and taking loperamide. *Id.* at 20. Ms. Volk also consulted with PA-C Ngo, who again issued no new orders. *Id.* PA Ngo considered whether Plaintiff's presentation required more urgent care, concluded it did not and instead, recommended Plaintiff present himself at sick call. Dkt. 38, Ngo Dec. at 4-5, ¶¶ 12-14.

### 3. Third Medical Emergency

Shortly before 6:30 a.m. on August 22, 2018, Plaintiff presented at the MCC infirmary, where he was seen by RN Kathy Mittge. Dkt. 19, Parker Dec., Ex. I at 23. Nurse Mittge spoke with Plaintiff and took his vitals. *Id.* Plaintiff remained at the infirmary until shortly after 8:00 a.m. when he was seen and examined by Defendant Horne. *Id.*, at 24. Defendant Horne examined Plaintiff's abdomen and rectal tone, and ordered blood tests, "stat," to see whether Plaintiff were suffering from anemia that would require further attention. Dkt. 30, Horne Dep., Ex. C at 54. Defendant Christiansen testified that not everyone who has stomach pain and/or rectal bleeding goes to the hospital emergently. Many times, the patent is observed to see if they are becoming anemic and the results of the blood tests ordered by Defendant Horne would have taken roughly an hour. Dkt. 31, Barbara Dec., Ex. B, Christiansen Dep., 68:5-14.

Plaintiff states "profuse" amounts of dark red blood was dripping from his colon, he was experiencing excruciating pain and he conveyed this to medical staff, but they left him in the waiting room from 6:30 a.m. to 8:10 a.m., while blood dripped from him in quantities sufficient to require that a porter be called to clean the floor. Dkt. 20, Declaration of Jesse Duhamel, ¶¶ 6-7. Plaintiff also states that his stool sample was full of blood and that he was sent back to his cell while he was actively bleeding. *Id.* at ¶ 8.

Plaintiff's medical notes confirm the presence of "frank blood" in Plaintiff's stool sample. Dkt. 19, Parker Dec., Ex. F (August 22 6:26 am Emergency Response Record). Defendant Horne testified that had Mr. Duhamel presented that morning with active bleeding from his rectum, she would have noted this in his records and she would have been concerned about the loss of blood, anemia and/or damage to Plaintiff's colon or intestines. Defendant Horne testified that when she saw Plaintiff that morning, there was nothing about his presentation to suggest he was in danger of collapsing, losing consciousness, or to indicate that his condition was emergent. Dkt. 30, Ex. C, Dep. of Adelaide Horne, 62:15– 64:23.

   4. <u>First Transport to EvergreenHealth</u>

Plaintiff states he continued to bleed while he walked back to his cell and left a trail of blood from the hall telephone, where he stopped to try to make a phone call to his mentor to ask for help, to his cell. Dkt. 19, Duhamel Dec. at ¶ 9. About ten minutes after Plaintiff left the medical unit, a corrections officer found Plaintiff on the floor "'unresponsive,' blood on shorts, reports he felt dizzy lay down on the ground…". Dkt. 19, Parker Dec., Ex. D (Grievance Investigation Report).

REPORT AND RECOMMENDATION - 5

At 8:40 a.m., Defendant Christiansen evaluated Plaintiff in the infirmary, ordered IV fluids, and directed Plaintiff be transported via ambulance to EvergreenHealth hospital. Dkt. 19, Parker Dec., Ex. K (August 22 Primary Encounter Report).

At the Evergreen Health emergency room, "a CT scan with colitis and GI pathogen negative" were performed, the "plan was for outpatient therapy," and Plaintiff was returned to MCC. Dkt. 19, Parker Dec., Ex. A at 41.

### 5. Second Transport to EvergreenHealth

During the afternoon of August 22, 2018, MCC again sent Plaintiff to EvergreenHealth, where he was admitted and treated from August 22, 2018 until August 30, 2018. Dkt. 19, Barbara Dec., Ex. N at 38-43. Plaintiff was given antibiotics, IV nutrition, pain medication, and underwent a colonoscopy. *Id.* Plaintiff was also given a low-dose of Metroprolol for four days to resolve an episode of tachycardia (rapid heartbeat). *Id.* at 42. On August 30, 2018, Plaintiff was discharged to MCC with a recommendation for a regular diet. *Id.* at 43.

### 6. Plaintiff's Grievance

Plaintiff filed a grievance related to the quality of care he received at MCC, which was investigated by RN Debbie Gingeresky. Dkt. 19, Parker Dec., Ex. D at 10-11. Ms. Gingeresky's investigative notes state, in relevant part:

> Findings substantiate that Duhamel has an ongoing chronic condition relating to diarrhea and has been followed quite closely by the TRU providers who continued to assess reasons for his ongoing symptoms. Lab work and other additional testing did not point to acute changes happening until the frequency of bright red bloody stools increased. GI Consult was authorized on 7/5/18 through CRC and processed as routine to have follow up within 2 months. As symptoms worsened, it does not appear that the consult was changed to urgent status. Treatment modalities between medical and dental priorities appear to have exacerbated Duhamel's 810870 condition along with his own participation in self medication. On the morning of 8/22/18, based on the frequency and frankness of bloody stools, Duhamel should not have been sent back to his cell after being seen

REPORT AND RECOMMENDATION - 6

in the clinic. A transfer to WSR/IPU would have allowed for increased monitoring of his condition in a more controlled environment.

Ms. Gingeresky's recommended response to Plaintiff's grievance is as follows:

> Though you have a chronic condition with your bowels, and though your lab work and tests remained within normal limits and were not showing that acute changes were happening, review of your chart indicates your status was changing and that you made efforts to communicate this to staff, especially in relation to your increased frequency of red bloody stools and abdominal pain. It appears that some of the medications you were taking for your neck pain, back pain, and dental issues, may have increased your GI condition, in addition to you taking the Naproxen over the counter medication, which was not an ordered medication for you. Your condition initially presented as being stable, yet still needing close monitoring, which your providers were doing. But at the point that it started becoming more acute, a transfer to WSR/IPU would have provided much closer monitoring and immediate support, rather than sending you back to your cell. I am upholding your grievance.

Dkt. 19, Parker Dec., Ex. D at 11. Plaintiff's grievance was upheld at all levels. Dkt. 19, Parker Dec., Ex. C (Initial Grievance), Ex. O (Level 2 Grievance); Ex. E (Level 3 Grievance).

## DISCUSSION

**A.      Summary Judgment Standard**

Summary judgment is appropriate when, viewing the facts in the light most favorable to the nonmoving party, there is no genuine dispute as to any material fact that would preclude the entry of judgment as a matter of law. *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir.2000). The party seeking summary dismissal of a claim "bears the initial responsibility of informing the district court of the basis for its motion" (*Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)) and identifying those portions of the materials in the record that show the absence of a genuine issue of material fact (Fed. R. Civ. P. 56(c)(1)).

Once the moving party has satisfied its burden, it is entitled to summary judgment if the non-moving party fails to designate "specific facts showing that there is a genuine issue for trial." *Celotex Corp.*, 477 U.S. at 324. "The mere existence of a scintilla of evidence in support

REPORT AND RECOMMENDATION - 7

1  of the non-moving party's position is not sufficient:" the opposing party must present probative
2  evidence in support of its claim or defense. *Arpin v. Santa Clara Valley Transp. Agency*, 261
3  F.3d 912, 919 (9th Cir.2001); *Intel Corp. v. Hartford Accident & Indem. Co*., 952 F.2d 1551,
4  1558 (9th Cir.1991). In other words, "summary judgment should be granted where the
5  nonmoving party fails to offer evidence from which a reasonable jury could return a verdict in its
6  favor." *Triton Energy Corp. v. Square D Co*., 68 F.3d 1216, 1221 (9th Cir.1995).

**B.     Evidentiary Challenges**

Defendants argue that Plaintiff's expert Ms. Olmstead, who is a nurse practitioner at a correctional facility in Arizona, is not qualified to opine about whether Defendants Christiansen and Horne, as physician assistants, violated the standard of care. Plaintiff, in turn, moves to strike portions of the Declarations of Deborah J. Gingeresky and Phu Ngo, as neither have been identified as expert witnesses, but who rely on scientific, technical, or specialized knowledge to opine as to the professional standard of care provided by Defendants.

1.     <u>Pamela Olmstead RN, MSN, FNP-BC</u>

Ms. Olmstead is a certified nurse practitioner and registered nurse with a Master of Science in Nursing. Dkt. 21, Declaration of Pamela Olmstead, Ex. A (Curriculum Vitae). Ms. Olmstead has been a practicing nurse for 21 years; has worked in the Michigan Department of Corrections and Arizona Department of Corrections; and is currently certified and practicing as a nurse practitioner. *Id.* at 1.

Defendants contend that Ms. Olmstead, as a nurse practitioner, is not qualified to opine as to the professional standards applicable to physician assistants in the State of Washington, because she does not practice in the same field. "To establish the standard of care required of professional practitioners, the standard must be established by the testimony of experts who

REPORT AND RECOMMENDATION - 8

practice in the same field." *McKee v. American Home Products, Corp.* 113 Wash.2d 701, 706 (1989). However, "to practice in the same field means that a pharmacist may not define the standard of care for a physician…and that a physician may not do so for a pharmacist." *Morten v. McFall*, 128 Wn. App. 245, 253 (2005). It is the scope of the expert's knowledge, rather than his or her professional title, which governs the question of admissibility of expert medical testimony in a medical malpractice case. *Hill v. Sacred Heart Medical Center*, 143 Wn. App. 438, 447 (Wash. Ct. App. 2008); *see also Pon Kwock Eng v. Klein*, 127 Wn. App. 171, 172 (2005). So long as the expert has sufficient expertise to demonstrate familiarity with the procedure or medical problem at issue, they are qualified to express an opinion. *Id.*

According to Defendant Christiansen, who is a physician assistant, nurse practitioners are both mid-level providers and have the same expected responsibilities in providing medical care for DOC inmates. Dkt. 36, Second Barbara Dec., Ex. B (Deposition of Patricia Christiansen), at 13:16-22. As a nurse practitioner and registered nurse who has provided medical care to inmates, Ms. Olmstead has sufficient expertise to opine on whether Defendants violated the standard of care in treating Plaintiff. As noted by Plaintiff, the differential between Ms. Olmstead's position as a nurse practitioner in other correctional institutions and Defendant Horne's and Defendant Christiansen's positions as physician assistants, go to the weight of her testimony and not its admissibility.

2. <u>Plaintiff's Motions to Strike</u>

To oppose a motion for summary judgment, the non-moving party must set forth facts that would be admissible at trial. Fed. R. Civ. P. 56(c)(4). When a party relies upon evidence that is inadmissible, such evidence can be stricken by the court. *See, e.g.*, Fed. R. Civ. P. 56(c)(2); Local Civil Rule 7(g) (recognizing the permissibility of motions to strike).

1     Plaintiff challenges those portions of the declarations of Deborah J. Gingeresky and Phu Ngo which rely on scientific, technical, or other specialized knowledge because they were not disclosed as experts in this and should therefore be considered lay witnesses. *See* Fed. R. Civ. P. 26(a)(2) (establishing that parties must disclose the identity and written reports of witnesses who they may use to present evidence under Federal Rules of Evidence 702, 703, and 705). Ms. Gingeresky, a registered nurse and supervisor, investigated and analyzed Plaintiff's grievance relating to the health care at issue. Mr. Ngo, a physician assistant, was the on-call medical provider on the dates at issue. Accordingly, the Court has considered the declarations of these witnesses to the extent the statements therein are rationally based on their personal knowledge, perceptions, involvement in Plaintiff's medical care and/or grievance, and medical experience.

    Plaintiff also argues that Ms. Gingeresky cannot authenticate the medical records attached to her declaration as she is not a custodian of such records. However, the authentication of these records is not in dispute. As a nursing supervisor, Ms. Gingeresky was tasked with investigating Plaintiff's grievance relating to his health care in September 2018. Dkt. 37, Gingeresky Dec., ¶ 3. Ms. Gingeresky interviewed Plaintiff, reviewed his medical records, and provided her analysis and conclusion. *Id*., 3-4. Plaintiff relies on Ms. Gingeresky's grievance investigation report and produced the same medical records in support of his motion. *See* Dkt. 19 and attached exhibits. Therefore, the medical records have been properly authenticated for purposes of the instant motions and this portion of the motion to strike is denied.

**C.**     **Section 1983**

    A prisoner plaintiff claiming an Eighth Amendment violation due to a medical condition must show deliberate indifference to a serious medical need. *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). Deliberate indifference to a serious medical need requires an official "knows of and

REPORT AND RECOMMENDATION - 10

disregards an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Deliberate indifference requires more culpability than ordinary lack of due care for a prisoner's health. *Id*. at 835. A court's inquiry must focus on what the prison official actually knew, not what the official should have known. *See Wallis v. Baldwin*, 70 F.3d 1074, 1077 (9th Cir. 1995).

Deliberate indifference is a high legal standard. *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004). It is comparable to criminal recklessness, and is shown by "something approaching a total unconcern for [the plaintiff's] welfare in the face of serious risks, or a conscious, culpable refusal to prevent harm." *Duane v. Lane*, 959 F.2d 673, 677 (7th Cir. 1992); *Schaub v. VonWald*, 638 F.3d 905, 933–34 (8th Cir. 2011) (Plaintiff bears the burden of proving the defendant's mental state was akin to criminal recklessness: disregarding a known risk to the inmate's health.). A failure or refusal to provide medical care is an Eighth Amendment violation only under exceptional circumstances approaching failure to provide care at all. *Shields v. Kunkel*, 442 F.2d 409, 410 (9th Cir. 1971).

The Eighth Amendment standard requires proof of both objective and subjective components. *Hudson v. McMillian*, 503 U.S. 1 (1992). First, the deprivation alleged must objectively be sufficiently serious that it results in a denial of the "minimal civilized measures of life's necessities." *Farmer*, 511 U.S. at 834 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). To prove this objective component, an inmate must establish (1) there was some degree of actual or potential injury and (2) society considers the acts or omissions of which the plaintiff complains to be so grave that exposing anyone to the acts or omissions, unwillingly, violates contemporary standards of decency. *Helling v. McKinney*, 509 U.S. 25, 36 (1993); *see also Estelle*, 429 U.S. at 97.

REPORT AND RECOMMENDATION - 11

Second, the subjective component requires that the prison official possess a sufficiently culpable state of mind: "deliberate indifference to inmate health and safety." *Farmer*, 511 U.S. at 834-36. With regard to deliberate indifference, a prison official is not liable "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id*. at 837. If either component is not established, the court need not inquire as to the existence of the other. *Helling*, 509 U.S. at 35.

Finally, it is well established that, "[a] difference of opinion between a physician and the prisoner—or between medical professionals—concerning what medical care is appropriate does not amount to deliberate indifference." *Snow v. McDaniel*, 681 F.3d 978, 987 (9th Cir. 2012), *overruled in part on other grounds by Peralta v. Dillard*, 744 F.3d 1076, 1083 (9th Cir. 2014); *Toguchi*, 391 F.3d at 1058 ("a mere 'difference of medical opinion . . . [is] insufficient, as a matter of law, to establish deliberate indifference,'" (quoting *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir.1996))).

The summary judgment evidence does not reflect that any of the Defendants acted with deliberate indifference to Plaintiff's health complaints. The record shows that Defendants Shaw, Christiansen, and Horne responded to Plaintiff's health complaints, examined him, and made informed judgment calls about whether additional care was required. Defendant Shaw consulted with PA-C Ngo after examining Plaintiff. Defendant Horne examined Plaintiff, ordered stat labs, and awaited the results to see whether care that was not indicated by Plaintiff's presentation was warranted. Defendant Christiansen started IV fluids on the morning of August 22 and directed Plaintiff be transported by ambulance to the emergency room. And in fact, when Plaintiff was first sent to EvergreenHealth, he was returned to MCC for continued care.

REPORT AND RECOMMENDATION - 12

Plaintiff argues the responses to his grievances indicate his care was inadequate and that Defendant Horne "admitted that she 'could have'" sent him to the emergency room. Dkt. 33 at 1-2. Defendant Horne's testimony, in context, was she thought her medical assessment was accurate and the plan she had in place was sufficient. However, because she was "quite new to working as a PA at that time," "there's an argument to be made that I could have just sent the patient to the ER right away as well too." Dkt. 30, Ex. C, Horne Dep., 52:2-10; 63:16-65:11. In addition, Defendant Horne's testimony regarding the significance of pain complaints alone is uncontested:

> Q. …If a patient is in a lot of pain or severe pain, is that a cause to send them to the hospital?
>
> A. Not necessarily.
>
> Q. How do you determine how much pain a patient has to be in before they go to the hospital?
>
> A. When I determine if a patient needs to go to the hospital, you know, it's based on not just their pain but on other indications that something medically is happening that's life threatening, and pain is not necessarily a clear indicator of something being life threatening. So that would be—that would encompass anything from a physical assessment to lab results to history.

Dkt. 30, Ex. C, Horne Dep, 73:12-24. Defendant Christiansen testified about the very approach taken by Defendant Horne:

> Q. And do you know why he was not sent out to the hospital at this point?
>
> A. At this point?
>
> Q. Yeah.
>
> A. Because we were waiting for the blood work.
>
> Q. And why would you wait for the blood work before sending them out?
>
> A. Not everybody who has blood on a rectal exam needs an emergency visit.

REPORT AND RECOMMENDATION - 13

| | | |
|---|---|---|
| Q. | | Wasn't this the third emergency in the last 12 hours? |
| A. | | Yes. |
| Q. | | That would not indicate to you that he needed to go out or be seen by a doctor? [Objection omitted] |
| A. | | Not necessarily. |
| Q. | | All right. Can you tell me why? |
| A. | | Not everybody who has stomach pain or even has rectal bleeding goes to the hospital emergently. Many times, you observe a patient to see if, based on their blood work, they are becoming anemic. |
| Q. | | How do you determine whether or not they're becoming anemic by the testing of the blood? |
| A. | | By ordering the labs that she ordered, and she ordered them, stat to have the results back as soon as possible, which would have been roughly an hour. |

Dkt. 31, Ex. B, Christiansen Dep, 67:14-68:14.

Also, the grievance responses do not indicate any of the Defendants' assessment or medical judgment amounted to a deliberate indifference to Plaintiff's care. Rather, the grievance investigator concluded that "a transfer to WSR/IPU would have provided much closer monitoring and immediate support, rather than sending you back to your cell." There is no evidence to suggest that the outcome of Plaintiff's care would have been any different had this occurred. In fact, Plaintiff's own expert suggests only a difference of opinion, *i.e.*, that Plaintiff should have been moved to the IPU for closer monitoring. However, she also acknowledged that Plaintiff's presentation was not emergent in the sense that he needed to be sent to the emergency room at any point prior to when Defendant Christiansen sent him out. Dkt. 27, Olmstead Dep., 58:1-10 ("At that point for the second medical emergency … in several hours for the same problem, … they should have considered closer monitoring."); *id.*, 60:15-23 (Nothing emergent,

REPORT AND RECOMMENDATION - 14

1  *i.e.*, requiring Plaintiff to be sent out by ambulance to an emergency room at 1:25 a.m. on August
2  22, 2018.); *id.*, 62:1-13 (Although she would have kept him a few more hours to continue
3  monitoring, there was nothing about Plaintiff's physical presentation at the second medical
4  emergency that required further monitoring.)

5  More importantly, Plaintiff's expert offered no opinion or suggestion of how a different
6  course of treatment would have altered Plaintiff's care. Ms. Olmstead states that she would have
7  kept Plaintiff in the infirmary setting, where he "could have had more dynamic monitoring,"
8  however, as noted by Defendants, monitoring in the infirmary is not treatment and there is
9  nothing to indicate that Plaintiff's condition would have changed in any way. Ms. Olmstead also
10 acknowledges that even after Plaintiff declared his third emergency, when his presentation was
11 worse and Defendants sent him out, the medical professionals at the emergency room sent him
12 back to MCC. Dkt. 27, Olmstead Dep., 68:1-20.

13 Based on the foregoing, the undersigned concludes that at best, Plaintiff has shown a
14 difference of opinion between medical professionals concerning what medical care was
15 appropriate. However, such difference of opinion does not amount to deliberate indifference nor
16 is there other evidence of deliberate indifference. Accordingly, the undersigned recommends that
17 Defendants are entitled to summary judgment on Plaintiff's Section 1983 claims.

18 **D.    Disability Discrimination**

19 Plaintiff alleged claims under the Americans with Disabilities Act and the Rehabilitation
20 Act of 1973 in his Complaint for Damages. Dkt. 2 at 7-9, ¶¶ 37-46. Plaintiff "stipulates to the
21 dismissal of his disability discrimination claim." Dkt. 33 at 13, Sec. V.C. Accordingly, it is
22 recommended that Plaintiff's claim for disability discrimination under the ADA and the
23 Rehabilitation Act be dismissed with prejudice.

REPORT AND RECOMMENDATION - 15

E.  **Negligence**

To recover damages for negligent medical treatment, the plaintiff must establish that the physician did not comply with the accepted standard of care. RCW 7.70.030(1). Under RCW 7.70.040, a plaintiff must prove:

> (1) The health care provider failed to exercise that degree of care, skill, and learning expected of a reasonably prudent health care provider at that time in the profession or class to which he belongs, in the state of Washington, acting in the same or similar circumstances;
>
> (2) Such failure was a proximate cause of the injury complained of.

The issue of proximate cause is generally a question for the jury. *Attwood v. Albertson's Food Centers, Inc.*, 92 Wash.App. 326, 330, 966 P.2d 351 (1998) (citing *Bernethy v. Walt Failor's, Inc.*, 97 Wash.2d 929, 935, 653 P.2d 280 (1982)). Proximate cause is, however, a question of law for the court if "the facts are undisputed and the inferences therefrom are plain and incapable of reasonable doubt." *Attwood*, 92 Wash.App. at 330, 966 P.2d 351.

In a medical negligence case, summary judgment is not appropriate if "a reasonable person could infer, from the facts, circumstances, and medical testimony, that a causal connection exists." *Attwood*, 92 Wash.App. at 330, 966 P.2d 351. But the evidence must "rise above speculation, conjecture, or mere possibility." *Attwood*, 92 Wash.App. at 331, 966 P.2d 351. "[M]edical testimony must demonstrate that the alleged negligence 'more likely than not' caused the later harmful condition leading to injury; that the defendant's actions 'might have,' 'could have,' or 'possibly did' cause the subsequent condition is insufficient." *Attwood*, 92 Wash.App. at 331, 966 P.2d 351. In this case, Plaintiff contends that as a direct and proximate result of Defendants' actions and omissions, he has suffered, *inter alia*, chronic pain and aggravation of his pre-existing medical conditions. Dkt. 1-2, at 11.

Summary judgment on Plaintiff's claim of negligence is not appropriate as there exist material issues of fact as to whether Defendants were negligent in their treatment of Plaintiff and whether that negligence more likely than not caused injury to Plaintiff.

RN Olmstead opined that during Plaintiff's second and third medical emergencies at 1:23 a.m. and 6:26 a.m. on August 22, 2018, Defendants Horne and PA Phu Ngo should have moved him to a higher level of care or an infirmary setting for closer monitoring, which would have potentially avoided an emergent hospitalization. Dkt. 21, Olmstead Dec., Ex. B, at 6-7. In her investigation of Plaintiff's grievance, RN Gingeresky agreed that Plaintiff should have been transferred to the WSR/IPU. *See* Dkt. 19, Parker Dec., Ex. D at 11 ("But at the point that [your condition] started becoming more acute, a transfer to WSR/IPU would have provided much closer monitoring and immediate support, rather than sending you back to your cell.").

Additionally, there are material issues of fact remaining as to Plaintiff's presentation during his declared emergencies. According to Plaintiff, at each of his visits to the TRU, he told the attending nurse that he was bleeding. Dkt. 20, Duhamel Dec., ¶¶ 4-6. Plaintiff states that he was terrified and feared for his life, he was vomiting and had diarrhea, and his pain was a 10 out of a 10. *Id.*, ¶ 6. By the time of his third declared emergency, Plaintiff states he was in excruciating pain, a "profuse" amount of dark red blood was dripping from him to the floor, and Corrections Officer Pruitt called a porter to clean it up. *Id.*, Duhamel Dec., ¶¶ 6-7. Plaintiff's stool sample confirmed the presence of "frank blood." Dkt. 19, Parker Dec., Ex. F (August 22 6:26 am Emergency Response Record). In her investigation of Plaintiff's grievance, RN Gingerseky noted that the previously ordered routine GI consultation should have been changed to urgent status as Plaintiff's symptoms worsened. Dkt. 19, Ex. D at 11.

REPORT AND RECOMMENDATION - 17

On the other hand, Defendants maintain there was nothing about Plaintiff's presentation to suggest that he was in danger or that his condition was emergent. For example, Defendant Horne testified that had Plaintiff presented that morning with active bleeding from his rectum, she would have noted this in his records but when she saw Plaintiff at his third declared emergency, there was nothing about his presentation to suggest that his condition was emergent. Dkt. 30, Ex. C, Dep. of Adelaide Horne, 62:15– 64:23. However, Defendant Horne also ordered tests to look for evidence of blood loss based on Plaintiff's report that he was losing blood. *Id.*, 37:10-25; 38:18. In addition, when Defendant Horne examined Plaintiff's rectum, the glove came out bloody. Dkt. 20, Duhamel Dec., ¶ 8. Plaintiff posits that if he had not been made to walk back to his cell while bleeding from his rectum with blood dripping down his legs and staining his pants, he would have been saved from not only the agony of excruciating abdominal pain but also the mental and emotional anguish coming from his belief that he was going to die soon, if not that day. *Id.* ¶¶ 6-12.

Based on the foregoing, the undersigned concludes that "a reasonable person could infer, from the facts, circumstances, and medical testimony, that a causal connection exists between Defendants' acts and omissions and Plaintiff's claimed injury. Because material issues of fact remain, it is recommended that both motions for summary judgment on Plaintiff's negligence claim be denied.

**F.    Outrage**

To succeed on a claim for the tort of outrage, a plaintiff must show: "(1) extreme and outrageous conduct; (2) intentional or reckless infliction of emotional distress; and (3) actual result to the plaintiff of severe emotional distress." *Snyder v. Medical Serv. Corp. of Eastern Wa.*, 145 Wash.2d 233, 242, 35 P.3d 1158 (2001) (en banc) ("Snyder II" ) (quoting *Birklid v.*

*Boeing Co.*, 127 Wash.2d 853, 867, 904 P.2d 278 (1995) (en banc)) (internal quotation marks omitted). The purported conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable to a civilized community." *Birklid*, 127 Wash.2d at 867, 904 P.2d 278 (quoting *Grimsby v. Samson*, 85 Wash.2d 52, 59, 530 P.2d 291 (1975)). Although "the question of whether certain conduct is sufficiently outrageous is ordinarily for the jury, [ ] it is initially for the court to determine if reasonable minds could differ on whether the conduct was sufficiently extreme to result in liability." *Dicomes v. State*, 113 Wash.2d 612, 630, 782 P.2d 1002 (1989) (en banc) (citing *Phillips v. Hardwick*, 29 Wash.App. 382, 387, 628 P.2d 506 (Wash.Ct.App. 1981)).

As previously discussed, the undisputed facts in this case demonstrate at best, there are questions of fact regarding whether the DOC medical professionals acted in a negligent manner in failing to monitor Plaintiff more closely. Negligence is not sufficient to sustain a claim of outrage; instead, there must be evidence that defendant(s) acted intentionally or recklessly toward Plaintiff. *Birklid*, 127 Wash.2d at 868, 904 P.2d 278. There is no evidence that Defendants acted intentionally or recklessly toward Plaintiff.

Accordingly, the undersigned recommends that Plaintiff's claim of outrage be dismissed with prejudice.

## CONCLUSION

Based on the foregoing, the undersigned concludes that Defendants were not deliberately indifferent in their medical care of Plaintiff and their conduct was not outrageous. There are material issues of fact remaining as to whether Defendants acted negligently. Thus, it is recommended that Plaintiff's motion for partial summary judgment (Dkt. 18) be **DENIED**;

Defendants' motion for summary judgment (Dkt. 24) be **DENIED** as to Plaintiff's claim of negligence; and **GRANTED** as to the remainder of Plaintiff's claims.

### OBJECTIONS AND APPEAL

This Report and Recommendation is not an appealable order. Therefore, a notice of appeal seeking review in the Court of Appeals for the Ninth Circuit should not be filed until the assigned District Judge enters a judgment in the case.

Objections, however, may be filed and served upon all parties no later than **May 26, 2021**. The Clerk should note the matter for **May 28, 2021**, as ready for the District Judge's consideration if no objection is filed. If objections are filed, any response is due within 14 days after being served with the objections. A party filing an objection must note the matter for the Court's consideration 14 days from the date the objection is filed and served. The matter will then be ready for the Court's consideration on the date the response is due. Objections and responses shall not exceed seven (7) pages. The failure to timely object may affect the right to appeal.

DATED this 6th day of May, 2021.

BRIAN A. TSUCHIDA
United States Magistrate Judge

REPORT AND RECOMMENDATION - 20